Hear ye, hear ye, hear ye. The United States Court of Appeals for the 5th Circuit is now open according to law. God save the United States and this honorable court. Please be seated. Good morning, ladies and gentlemen. Welcome to this session of the Tulane Law School for hosting this event. We're doing a great job of making this comfortable and facilitating the proceedings and so we're grateful for that and it's a special event for all the judges. Let me also mention that I understand there are classes and other obligations and if people need to get up and leave or other people need to come in, none of us are going to be offended by that because we understand you have work to do and your own obligations as do we. So we're going to hear three cases to be submitted today on oral argument and we begin with United States v. Akula. Mr. Blaisance. I never know whether to give the New Orleans pronunciation or the Texas pronunciation. I'm from Lafourche, Paris so I'll take the New Orleans. Okay, Mr. Blaisance. Good morning, your honors. Mark Blaisance on behalf of Dr. Shiva Akula. Dr. Akula was subject to a jury verdict that was tainted by the court's denial of his right to present a defense by denying him to present an expert on Medicare billing. Judge, do you have a question? I'm just always eager. So that's your first issue, is the expert issue. Of course. Sufficiency is the second and sentencing is the third. If we get that far, correct. Yes, sir. I'd like to spend, obviously, I think I've reserved five minutes. Yes, you saved time for rebuttal. Excluding Dr. Greg Davis as an expert for Dr. Akula creates a constitutional violation. You have a right to present a defense. You have a right to call witnesses. The presentation of that defense cannot be hamstrung by rules of evidence. The United States Supreme Court has said that. But what is the standard of review? It's a fairly steep standard of review deferential to the district court on an evidentiary ruling. Abuse of discretion. I'm sorry? Abuse of discretion. And here he wasn't excluded entirely. Judge Afric said he can testify as to his clinician knowledge and patience, but he just can't talk about medical coding because he hasn't published in that area, he hasn't gotten a certificate in that area. Is that fair to say? Is that how Judge Afric split? That's how he did it. He allowed him, after the fact, to come back and talk about clinician activities and diagnoses. But focusing on the certificate and the publication or lack thereof, the government's expert had none of that or presented none of that. Ms. McMillan was a person who was retained. Right, but the issue here isn't comparative, is it? Excuse me? Right, the issue is not one of comparison. The issue is did Judge Afric make a mistake when he said, you've never been qualified before, you've never published in the area of medical coding, and you have no credentials there. Your expertise is as a doctor dealing with patients, so that's what you'll be allowed to testify to. What's the case that says, what's your best case that says that's an abuse of discretion? I've cited several cases in the brief.  I can't cite a list of cases. Are you aware of any circuit court that is reversed in that circumstance? And the second level question is, where in this record did you proffer what the expert would have said had he been allowed to? The second answer to the second part first, I don't see in the record. I'm appellate counsel. Yes, I know. But that's difficult because then Dr. Kula takes the stand. And of course he admits there was, quote, massive coding error. And so if the purpose of the expert was to say there's no coding error, the difficulty is how was there any prejudice if the defendant then takes the stand and says, quote, massive coding error? And I'm not sure, Dr. Dave, again, when I'm having a proffer in the record, it does make it difficult for you but primarily for me to argue what he would have said. But let's hypothetically say that he would not have said, oh, the coding is correct or wrong. He would have drawn the medical diagnoses to explain why such coding was done in such a manner. In comparison, Ms. McMillan looked at numbers. She looked at numbers and said, hospice doctors get per diems. In certain circumstances, they can build after that. Looked at all these bills that were done. The total loss attributed to your client was what? $64, $65 million? I think $42. $42 million. $42, $44. But again, that's an area where I don't find, because I would have brought it up, I didn't find sufficient objection to arguing that, look, you need to subtract all the good stuff. In other words, all of the billing related to medical treatment that no one disagrees with. That's an issue that some courts have said you can offset the amount that's attributed to a certain doctor for medical fraud. To your other issues, is your primary argument, as to the expert, that Judge Affreck committed Doe-Bear error? This man was qualified, and therefore was in Doe-Bear. Or is it a different due process violation that your entire defense was removed from you? Or is it both? Both. Yeah. Both. And if you can come up with a third one, I'll take that one, too. If we move to sufficiency, are you aware of any sufficiency case where an appellate court has reversed, even when the issue is one of scienter and the defendant took the stand? No. Yeah. Because the last question asked to him was, did you have any intention to defraud Medicare? He says no. That sounds like a classic jury issue. Right? Right. Because they could think it's an exculpatory no, and they could convict him just on that. And I'm glad you mentioned the jury, because the experts, that's also a jury issue from the fact that the jury gets to decide which expert they believe and how much. How much weight they want to give them and so forth and so on. But without that testimony, without that ability to question Dr. Davis along the same lines, and look, the judge could have very well, if he would have been admitted to testify and you brought up some issues, maybe those specific questions would have been objected to and the court would have said it's improper to ask that question. But when you totally leave him out because he doesn't have a certificate and he testified, but he taught the course thereafter? Moving on before you're out of time to the record and to the issues on the evidence. So as I understand it, the GIP is reimbursed at a much higher rate, and the evidence showed, at least the government established, that Dr. Akula used GIP billing to avoid the five-day limit on respite care. What is your answer to that? Is that what the record shows and how is that testified? I cannot stand here and contradict anything you say that the record says regarding the billing. In other words, and I think the author... Because the jury heard that, obviously. Yes, and I'm not foreclosing a sufficiency of evidence argument, but again, as you could tell... It is awfully hard for you under the sufficiency test where we defer to the jury verdict. If that was the issue, I'm not sure I'd be standing here this morning. You would have picked another case. I think it's because, honestly, hopefully you see what I see regarding the expert. And that's why the order of assignments of error are such in the brief to bring prominence to the one I see. Because if you find the judge is wrong, I think you can reverse and order a new trial, and Dr. Davis can testify. And then the GIPs, again, his testimony could be limited. The questions could be asked, not asked. The right way to go into much of that is cross-examination, not to just not qualify a person as an expert. And I didn't do that much of a look, but I think it's rare not to find a case where the court denied the qualification of an expert. Why do you rely on the Seventh Circuit case of Parra when the district court there qualified the expert based on his detailed experience in a specific expertise? Because that's what Dr. Davis has. He has expertise when it comes to coding. He taught it. He studied it. He implemented it daily in his practice and in his supervision of multiple nursing homes. But he struggled to answer questions regarding the levels of care and training on hospice care and billing, which is largely what this case is all about. His expertise was deficient on hospice care. And the jury could have considered that in weighing his testimony. I just find it difficult to see a situation where a court denied someone to present an expert, especially in a case like this, especially when the government has an expert. And I'd ask the court, I'll save the balance of my time. Well, I'd love to ask about the sentencing issue because your client was enhanced.  That's an issue. OK. So what's the line between when a sentencing judge can properly enhance a prison sentence because the sentencing judge thinks the defendant is not showing remorse, as distinct from when a sentencing judge punishes a defendant just for putting the government to its proof? What's the line? That is your argument, correct? Yes. You say Judge Afric enhanced his sentence simply because your client said, I'm not guilty, and exercised his right to go to trial. Correct. But you're not denying that a sentencing judge can look at the same defendant and say, no, you showed no remorse. Could you tease out what you're saying is the reversible error, why he erred on the first side and it wasn't a case about? Is that your argument? I think it's because in this case, the trial judge gave a lot of reasons why he enhanced the sentence. And I find it also difficult to see that a court can enhance a sentence because a person exercises their constitutional rights to go to trial, to fight every little thing. But there was another issue. There may have been several other issues on sentencing, but one of them was that Dr. Akula was guilty of numerous bond violations. And the court may have taken that into account. Yeah, I don't recall that that one was specifically delineated. I know the judge delineated numerous reasons. No, he extensively delineated. That's correct. The bond violations. I'm just wondering, what's the case that tells us how to separate the two? Valid enhancement because the man's showing disrespect for the law? Invalid enhancement because as a judge, you're frustrated that he even put you to a trial? There's a Supreme Court case. Excuse me for not having it handy here. Borden Kercher v. Hayes, United States Supreme Court, said to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. And to penalize a person's reliance on his legal rights is patently unconstitutional. So the next level of court, the Supreme Court has said, we can't do that. And what did Judge Afric say that you think got closest to saying, I'm putting you in jail longer because you put us through a trial? What's the – from sentencing? I think it's – you hit upon it, is he said that he could not see where a defendant had no remorse. Right, but then he's saying that's because you blame the prosecutor, you blame your own defense attorney, and then you got very angry even at me. So you're disrespecting the whole system. Correct. It doesn't sound like it's because you chose your right to go to trial. And Dr. Kula did not articulate that, but I think so. And assuming that's the remainder of my time, I'll save it. Thank you. Yes, you've saved time for rebuttal, Mr. Pleasant. Thank you. Mr. Borden? Mr. Borden? So as I frequently ask lawyers whom we've seen before, so how many Fifth Circuit arguments would this be for you, Mr. Borden? I had a feeling I could ask that. This is going to be somewhere around 31 or 32, I think. We had a federal public defender yesterday who said 75. We've had some people over 100. You've got some work to do. That's right. I know. I think there was one time, Judge Smith, I remember being in court and you asked that question and I was feeling good until my opponent said about 50 or 60. And I said, it's going to be long. Thank you, Judge Smith. May it please the court. Your Honors, this is not a medical malpractice case involving the standard of treatment of a patient. This is a criminal prosecution for fraudulent billing of Medicare in response to a certain part of Medicare that is very specific involving hospice billing. Dr. Acoula was involved in the scheme that ultimately involved $84 million being fraudulently billed to Medicare for hospice payments. $42 million of that was paid. In the district court and in this appeal, Dr. Acoula and the defense have focused on the treatment of the patient that may have been clinically needed. But as doctors, office administrators, expert witnesses, and others testified at trial, a hospital treatment care for clinical treatment purposes is not the same as hospice level billing care for reimbursement purposes. Because being an inpatient at a hospital for curative care is not the same thing as being general inpatient care for purposes of hospice billing. Am I correct that the discovery level both sides exchanged, okay, we've got an expert? Yes. Okay. And if I remember, Judge Afric did ask the government here, why didn't you move to disqualify as soon as you saw the credentials? Instead of waiting to the eve of trial when he couldn't find another expert, so it became government has this expert on coding, defense has nothing. Right. And that conversation was also had at the bench. The government responded to that, Judge Higginson. And the reason was because Dr. Davis, who was the expert for the defense, the pre-trial notice he put forth and the report he put forth dealt very heavily with the standard of care for the treatment side, for medically, clinically, not necessarily hospital billing. In fact, there's no talk of what's called the CPT codes in that pre-trial discovery. So the government was on notice that he was going to come in and treat about medical treatment. So unobjectionable, he's got the experience, you're expecting him to testify. As to that point. In fact, the government didn't object to that and ultimately the government stipulated with the defense that Dr. Davis would be allowed to testify as an expert in the area of clinical decision making for hospice eligibility. The problem here is that's not really what the case was about. The case was about hospice billing and the four levels of care in that. And Judge Smith, just to give a quick overview, you asked about the GIP level of care. Before you get off that topic though, so therefore your position is the government had no idea the defense was actually going to try to rebut the government's expert on coding until the last minute and that's when the objection occurred. That's correct. When trial counsel stands up and says I want to. Did they move for a recess or a continuance at all at that point? No, they didn't. I know that after it came off the stand there was a bench conference. Did you agree at that point the case is over because now you've got a government expert saying bad billing and they don't have anyone? Was that essentially a directed verdict at that point? No, I don't think so because I think if Dr. Akula did testify and if a jury would have believed Dr. Akula that this was erroneous, this was accidental. What's to say Dr. Akula didn't testify because now they don't have their expert defense? Your Honor, Dr. Akula actually testifies before Dr. Davis even occurs. Dr. Davis I believe was going to be the last. That's an important distinction here I think because it also goes to Dr. Akula's statements which you brought out on the stand that he acknowledges there were mistakes. They were incorrect which takes it all. At that point that's even another reason why we have a little issue with the expert here. The opposing counsel talk about the right to an expert is not simply statutory rules of evidence. It's constitutional but there are still rules in place. Under Rule 702 there's a witness and the testimony. It requires two things. The witness has to have the knowledge, skill, experience, training, or education. The testimony itself has to be such that the skill will help the trier of fact understand the evidence or determine the fact of the issue. The testimony is the product of reliable principles or method. If Judge Afric had said I don't see the certificates for the prior qualification. I do see the experience but experience isn't enough. That would be reversible error. Yes, because it doesn't come down to one thing. I disagree with opposing counsel on this. I don't think Judge Afric denied this specifically because he didn't have a certificate. In fact, in Judge Afric's order denying a motion for new trial and for post-judgment verdict of acquittal, he makes that point. It's not one thing. He called it the variety of problems. And that's where we come down here because even though someone might have the right to present a defense and even though there is a right to an expert testimony, Dobair and Kumho Tiers still expect the district court to be a gatekeeper of that and have a gatekeeping function. He cited the 11th Circuit ready decision. Are you familiar with that? The 11th Circuit did reverse a medical fraud conviction where the defense's experts were excluded. So how would you distinguish this case from that? I think the distinction here is there's absolutely nothing that came up to help this witness show that he was qualified to give an opinion on a relevant issue that was helpful here, specifically Medicare coding billing. And if you take a look at some of the things that happened, and all of this came out during the government's voir dire of the expert, but first as we go back, the pretrial notice that was given focused on clinical information. It didn't talk about Medicare regs. There's no talk about regulations or CPT codes in there, and there's certainly no talk about hospice billing in that area. As to Dr. Davis's prior history, he was a nursing home specialist. His practice involved outpatient internal medicine, but he was not a hospice biller or coder, and he had not done any medical reviews involving hospice billing. And hospice, as you know, and Medicare itself, a very well-regulated area here. This is not something that you just pick up off the street, and it's not necessarily something that one area of medicine just translates to another. Am I right that the defense never proffered what he would have said? That's correct. The most we have, Your Honor, is in the motion for post-judgment verdict and for new trial, which at that point I believe was a different defense counsel, not trial counsel. The argument was that the expert would have counteracted the government's expert, Laurie McMillan, and shown why the coding was correct or largely correct. The problem with that is that's not what Dr. Akula said. He blamed Mr. Raj. He blamed Mr. Raj. He blamed the office administrator, Sue May. He blamed Kelly Anderson. He blamed just about everybody for this. But what the evidence showed was that he was very micromanaging. He was involved. He was aware of a 2015 audit where Medicare told him there's all kinds of problems. 30 out of 30 cases that we've looked at were incorrectly billed at the GIP level of care. He knew that, did nothing about it. The conduct continued. Not only did the conduct continue, but the year after that audit, his salary and his income goes up by a half million dollars. Was the government's case on Sienter one of circumstantial proof or direct evidence? It was both, but ultimately the knowledge and intent does come from circumstantial evidence. And proving knowledge, of course, can be proven through circumstantial evidence. And you have that here. There's nothing in this case that has not been in previous cases that this court has affirmed. And here are some things of evidence of the knowledge. Dr. Akula was very hands-on, and this came on through the testimony of the office administrators and some of the doctors that were not necessarily knowledgeable of billing, but did rounds at Cannon Hospice, where Dr. Akula owned. Dr. Akula was micromanaged. He controlled the billing, which was run not by certified professional coders or trained, but by his family members. He had regular meetings, weekly meetings with those members. Often Dr. Akula, who was not treating the patients, he was just running the business, but he would overrule the decision of medical teams. And his whole defense was the opposite for what you just said. I treat patients. I don't run the business. If mistakes were made, I didn't make any of them, didn't know about them. Everybody else. But the problem with saying I didn't know about him was he's on notice from the 2015 audit, yet this continues to happen. Two audits in 2017, much of which covered the subject here, show the same thing. The 2015 audit letter said that Cannon had failed 100% of the claims. That's right. 30 of 30 claims did not have the documentation justifying the billing at the GIP, general inpatient level of care, or the CPT codes, which was for extra physician services. And what that's important, Judge Smith, you pointed out, the GIP level is one of the higher levels of care. It's significantly higher. The four levels of hospice care for hospice billing purposes are routine home care, which is the default. I think I saw one of the numbers is about $150 a day, according to witness Kelly Anderson. Then there's respite care where someone can come in when a caretaker or a hospice may need a break. That's roughly $400 a day, but there's a five-day limit for that. Then there's general inpatient care. General inpatient does not mean we just move you to a hospital and keep you there. That's when the patient suffers an acute event that cannot be handled on its own, and that person needs to come in to an inpatient setting for immediate. But the whole point of that is to get something done quickly, fix the problem, possibly uncontrolled vomiting, aspiration while eating food, terrible problems breathing, things like that. But that's supposed to be done very quickly and moved back. That's important because that rate is about $950, so significantly higher. The fourth one is continuous care, which is the most expensive. That really didn't come up in this case. But the documentation, Judge Smith, in that audit was the big problem for 30 of 30. We didn't have the documentation showing the medical necessity for general inpatient care billing for hospice billing purposes. That's what he knew, and that's ultimately what kept going on in 2017 in accounts that led to these convictions. It was the six patients that were the subject of this. He billed hospice. He billed Medicare for hospice billing significantly over the necessary stays at the general inpatient level, even though all the doctors that testified reviewed their notes and documented there wasn't an acute distress, there wasn't that chronic need to get someone in that. He billed at different CPT codes for physician-additioned services, and the problem is there is hospice is reimbursed on a per diem basis. There is nothing to add on to that for physician services, except in very specific situations. There were several of these here, and the documentation didn't support it. And again, Dr. Akul was the owner of the company. He said he signed documents saying he would comply with the regs. He was very focused on maximizing the number of patients. He wanted doctors to participate in marketing to bring more patients in. At one time on trial, he actually told, we're going to take anybody, one call, that's all, for admitting patients. There was a rule. We don't turn patients away. We don't discharge people without letting Dr. Akul know. He had the financial incentive. He made more money than anybody else which he admitted, and his explanations at trial, which the jury is entitled to reject, is that it was everybody else's fault. While everything is wrong, he admits we should not have been paid for these claims, but it's everybody else's fault. All of those things, all of those facts I mentioned, the hands-on, being aware of the issues, not wanting others involved, being the owner, focusing on the numbers, these are all things which in different cases this court has said, those facts have affirmed the inference of knowledge. And that's the Gibson case, the Reed case, the Willett case, and to some extent Thompson and Bars, all of which are in our brief at pages 24 to 28. All of those cases would support a conviction and proof of knowledge on any of the things I just mentioned. All of them are here now. What was his guideline range? The guideline range came out to 151 to 188 months. The ultimate sentence is 240, which was an upward variance by the judge. Big upward variance. It's big. Did the government ask for that? I don't believe the government asked for it. So Judge Affrick just decided I'm going to give you, what, close to five years more? It was close. It was about four and a half years more, but the judge gave reasons for it, specific reasons. What happens if he gave some valid reasons but an invalid one, saying I also think you should have shown remorse? I think under his court's cases in other contexts you could look at was it a predominant factor. That's the test. That would be, but I don't think you have that here. I think what you have is several things. This is not a case talking about I'm punishing you for going to trial. This is more the disrespect for the law, the failure to accept responsibility. We cite the Douglas case. Tell us about the bond violations. What were those? Sure. The bond violation, he was not complying with probation's requirements to disclose financial records. There was an $84 million intended loss, $42 million payment, which is the restitution amount. So he was not complying with the requirement to show the funds. I think there was also concerns about is he moving the funds to avoid? And Judge Afric got tired of it at some point. That was the problem. So, again, it was another situation of showing disrespect to the system, blaming others, not showing any remorse for something that Judge Afric said, his words baffling and incomprehensive in light of all this. But this sentence was not just about going to trial. It was about his characteristics, his behavior. It wasn't about going to trial at all, correct? Is that your position? Judge Afric said nothing critical about exercising his right to go to trial? No. I think the only thing he didn't get by going to trial was he wouldn't have gotten a three-point acceptance of responsibility. I do think there's a perilous area when judges sentence and use the word no remorse because it's ambiguous enough that it can be seen like, oh, you think I had to plead guilty. That's sort of what's happening in these cases that we see now and then. I understand. I don't think Judge Afric's in total looking at everything. But he did say, I've never seen a defendant with less remorse. With less remorse. But that was also after he testifies, after he puts his own blaming everybody else in picture. So we have testimony. It's not just a decision to go to trial. We actually have testimony that Judge Afric's listening to and weighing against all the other evidence and all the other witnesses and also understanding what Dr. Akula's behavior has been, showing the disrespect. But ultimately, it's about... Did he change counsel? He changed counsel many times, Judge. And again, in fact, sentencing counsel was not trial counsel, I believe. There was several times he was about to represent himself. There was standby counsel. He had fired counsel. He disagreed. Trial counsel had, I forget what the number was, but it was one of many that finally did it. But between trial and sentencing, I believe, there was another counsel. So this is an... He's had issues with counsel. He had issues with the judge. He had issues with the prosecutors of making bar complaints, of filing a RICO suit. So you would say the enhancement was for disrespect of the law and the system? Partially, because there's also the fact Judge Afric made a point of saying this is important for deterrence, and he said, I know doctors in the area are going to watch what I do here. And in this health care system, this was also meant to be a deterrent for this type of baffling and incomprehensive behavior that led to $84 million over a long time being fraudulently built in health care. And before I go on to anything, Judge Dickinson, I know you had asked about the expert. Is there any other questions that you have on that that I didn't answer to you? No. Let me ask you. Yes, sir. Maybe this could go to Counsel Hobson, but why shouldn't we perceive Acula's arguments as simply challenging district court's discretion in considering the relevant 3553 factors? I think ultimately that's really what he's doing. I know the argument was made that it violates the Eighth Amendment, but that's on plain error, and I don't think there's really anything that shows that. But ultimately this is just a disagreement with the 3553A factors, and this is a four-and-a-half-year enhancement, as Judge Dickinson pointed out, but Judge Weiner, I think this court has certainly affirmed upward variances of a much higher number and a much higher percentage. I don't think there's anything here that gives pause. So unless there are any other questions, just point out this is not a case, again, where the treatment is being questioned. The patient's got care. That's not the issue. What is the issue is fraudulently billing from Medicare services in a hospice setting where the documentation didn't do it and the evidence here showed Dr. Acula knew what he was doing. So unless there are no other questions, we'll submit on the brief and we'd ask the Court to affirm. Thank you, Mr. Bortman. Mr. Pleasant for rebuttal. Yes, Your Honor. A couple of quick points. You mentioned the Reddy case, and in the Reddy case, it actually cited this court. It said that questions concerning Dr. Morrissey's qualifications were for cross-examination. So, again, I'll harp on my point because I believe that Dr. Davis should have been allowed to testify on coding to explain the difference between good faith mistakes and fraudulent intent. And they could have asked numerous questions of Dr. Morrissey. You could have crucified him on cross-examination if they so chose. But don't take that away by not qualifying him as an expert when the government has one because it also tells the jury, look, they need experts in this case. How are we to know the jury didn't say, well, yeah, you're right, the government presented this package and had an expert who testified, and then we're not hearing anything from the defendant. And I think the point that has been overlooked, and perhaps I should have brought it up sooner, is the jury's request to see Ms. Laurie McMillan's report, I believe, is critical to the analysis of the necessity that the judge erred in not presenting or allowing Dr. Davis to testify as an expert. But you would agree Reddy is the one case you've submitted where there was a reversal. There, though, the two doctors who were going to testify were unequivocally credentialed. The district court said you don't know statistics, and the defense said we're not going to ask any questions about statistics. And the district court still excluded him. That's why the 11th Circuit reversed it. Here it's almost the flip, right? His point is you don't have the credentials in the one area where you're going to testify. And I dispute that he didn't have the credentials because, again, Dobear does not require that you have the precise credential, if you want to call it, or expertise on the one question that may come up. It's if it can help the jury. And I realize he was allowed to testify regarding some clinical matters. But if he could have been allowed to go further, to draw that into the billing process, because he testified that part of his experience was he did this every day. He billed. I put it out. I think he said he billed like 25 times a day for 19 years. So that's a hell of a lot of billing. And it's enough for him to be able to provide the jury an opposing view, and let the jury decide whether or not. Therefore, I call for a reversal in that area. Real quick on the, because, oh, and just for the record, he mentioned the lack of a certificate three times. So he did focus on no certificate. On the sentencing, real quick, yes, the judge said he relied on the lack of remorse and the failure to accept responsibility. And he said that obviously he had not seen anyone take less responsibility. But again, you have a right to maintain your innocence. You have a right to go to trial. You have a right to appeal. And like you said, the no remorse is really an ambiguous term, because it can lead to lots of arguments the way I'm arguing and lots of arguments. And I sort of put that in page 28 in the brief, that the no remorse must be understood in the context, in his heart and mind. Dr. Akula believed he did not commit fraud. And I think he had the right to continue expressing that, that there were mistakes made, that there was not any fraud. And I'll end by saying, for the record, since I wasn't asked, but I think this is my 12th or 13th time, including 30 years ago here at Tulane University on a desegregation case. I mean, it was a classroom, not a courtroom. So I'm glad to be here. Thank you. Thank you, Mr. Pleasant. Your case is under submission.